# IN THE COURT OF APPEALS OF IOWA

No. 20-0164
Filed March 3, 2021

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**CLINTON TRAVIS SAUVAIN,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Pottawattamie County, Michael Hooper, Judge.


        The defendant appeals his convictions and sentence for three counts of sexual abuse. **AFFIRMED.**


        Drew H. Kouris, Council Bluffs, for appellant.

        Thomas J. Miller, Attorney General, and Darrel Mullins, Assistant Attorney General, for appellee.


        Considered by Doyle, P.J., and Tabor and Ahlers, JJ.

**TABOR, Judge.**

Clinton Sauvain appeals his convictions for one count of second-degree sexual abuse and two counts of third-degree sexual abuse. His complaints are fivefold. First, he contends the State committed a *Brady* violation.[1] Second, he alleges the district court erred by not giving a spoliation instruction on that evidence. Third, he asserts the prosecutor engaged in misconduct. Fourth, he claims the court abused its discretion in not forcing disclosure of his accuser's entire mental-health treatment record. And fifth, he argues that the court abused its discretion by imposing consecutive sentences. Finding no merit in his complaints, we affirm.

## I.  Facts and Prior Proceedings

Fifteen-year-old T.G. testified that Sauvain sexually abused her repeatedly throughout her childhood, beginning when she was five years old.[2] She recalled that Sauvain would touch her breasts and vagina, force her to touch his penis, force her to engage in oral sex, and insert his penis into her vagina. Sometimes during these sex acts, T.G. felt something wet. According to her testimony, the abuse took place in her bedroom, the shower, or Sauvain's car.

In late November 2018, things changed. Then in ninth grade, T.G. was flunking classes and, as punishment, Sauvain grounded her. One morning, Sauvain came into her room and sexually abused her, touching her vagina and breasts with his fingers. He also tried to penetrate her vagina with his penis. Later,

---

[1] The prosecution has a due process obligation to disclose exculpatory evidence to the accused. *See Brady v. Maryland*, 373 U.S. 83, 87–88 (1963).
[2] Sauvain is her stepfather.

while driving her to school, he tearfully apologized and promised to "unground" her. At school, two of T.G.'s friends, who knew about the abuse, caught her taking pills in a suicide attempt. The friends informed school staff. These events led T.G. to disclose the abuse to her school principal. That same day, T.G. went to the hospital for a sexual-assault examination. Her rape kit did not reveal any DNA evidence. Nor did the sexual-assault nurse examiner see any physical injuries. A swab of her external genitalia showed no foreign DNA.

After T.G. reported the abuse, the Iowa Department of Human Services (DHS) removed her from Sauvain's home. She moved in with her father and stepmother. She also began seeing a therapist.

About three weeks later, law enforcement, including a crime scene investigator (CSI) with the Iowa Division of Criminal Investigations (DCI), searched T.G.'s bedroom in Sauvain's house. They collected bedding but found no DNA belonging to Sauvain on those items.

Based on T.G.'s recollections, in December 2018 the State charged Sauvain with eight counts of sexual abuse. On the eve of trial, the State amended the information to three counts: one count of sexual abuse in the second degree, in violation of Iowa Code sections 709.1(3) and 709.3(1)(b) (2018), and two counts of sexual abuse in the third degree, in violation of Iowa Code section 709.4(1)(b)(3)(a) and 709.4(2). The jury found Sauvain guilty as charged.

At sentencing, the court imposed consecutive terms not to exceed twenty-five years on the second-degree sexual abuse conviction (with a mandatory minimum of seventy-percent) and ten years for each of the third-degree sexual abuse convictions. Sauvain appeals.

**II. Discussion**

Sauvain's first three issues focus on the seizure and testing of T.G.'s bedding. The State collected that evidence through the work of detective Amber Kennedy. Detective Kennedy started her investigation by speaking with T.G. at her school on the day she disclosed the abuse in late November 2018. After contacting the DHS, Kennedy believed it was important to interview T.G.'s mother and Sauvain. Having gathered their statements, Kennedy met with the prosecutor. Only then did the detective secure a search warrant for the family's home. Law enforcement executed the search three weeks after T.G.'s disclosure.

On February 1, 2019, the State filed additional minutes of testimony including the detective's investigative report on the execution of the search warrant. When starting to search, Kennedy noticed, "In the home it appeared that someone had been there and had been packing items." Her narrative continued:

> The bedding on [T.G.'s] bed had been stripped off and a fleece blanket was the only thing left on it. I located a mattress protector that appeared to have been just removed from the bed and a bed sheet inside of it. Another mattress cover was located under a comforter. These items were the only bedding items that were not folded up and placed to the side.[3]

Kennedy's report also listed the items collected into evidence:

> Various items were collected to include the following:
> - black/white fleece blanket
> - purple/zebra striped comforter
> - two (2) mattress covers
> - grey/white sheet

---

[3] At trial, Kennedy explained the fleece blanket on the bed and the items on the floor "stood out as if maybe those hadn't been washed." Logically, if those items had not been laundered, they would "have more evidential value to them."

A separate property receipt established a chain of custody for the items collected. The receipt identified the "crime lab" as the location of the comforter and mattress covers, the black and white fleece blanket, and (relevant to Sauvain's arguments) the grey and white sheet.

On August 19, the State filed additional minutes of testimony outlining the DCI lab tests. The tested items included (1) "[p]urple/zebra striped comforter and mattress cover collected from upstairs bedroom," (2) T.G.'s sexual-assault kit, and (3) Sauvain's buccal swab. A DCI criminalist testified that the bedding did not have Sauvain's DNA. The mattress pad contained epithelial DNA from an unidentified male, but testing eliminated Sauvain as the source.

At trial, Sauvain objected to the fact the DCI lab did not test the grey and white bed sheet. Detective Kennedy testified she was not in charge of deciding which items got tested. That discretion fell to the prosecutor and the CSI based on the lab's limited testing capacity. Their decision not to have the bed sheet tested prompted Sauvain to ask for a spoliation instruction—advising the jurors that they may presume the evidence was unfavorable to the prosecution if a State actor intentionally destroyed it. The district court refused to give that instruction. In a motion for new trial, Sauvain alleged the court's refusal was reversible error. He also argued failure to test the bed sheet constituted a *Brady* violation and prosecutorial misconduct. The court denied the request for a new trial on all three grounds.

Our review of the new-trial denial depends on the grounds raised in the motion. *State v. Lopez*, 633 N.W.2d 774, 781 (Iowa 2001). To the extent Sauvain based his motion on discretionary grounds, we review for abuse of discretion. *See*

*id.* at 781–82. An abuse of discretion occurs when the court exercises its "discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Id.* at 778. To the extent that he based his motion on legal questions, we review for errors at law. *See id.* at 782.

We review the decision not to give a requested jury instruction for the correction of legal error. *See Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016); *State v. Hartsfield*, 681 N.W.2d 626, 630 (Iowa 2004). We review alleged due process violations de novo. *State v. Wickes*, 910 N.W.2d 554, 565 (Iowa 2018). We address each of Sauvain's grounds for a new trial in turn.

## A. *Brady* Violation

Sauvain contends the State committed a *Brady* violation when it failed to test the bed sheet. In his mind, the sheet was the most critical evidence collected because it is the layer of bedding closest to the body and thus would be most likely to contain a DNA specimen if T.G.'s accusations were true. Sauvain insists that if the lab had tested the sheet and not found his DNA, the results would have refuted T.G.'s testimony.

Without question, the prosecution has a due process obligation to disclose exculpatory information, including impeachment evidence.[4] *Brady*, 373 U.S. at 87–88; *State v. Leedom*, 938 N.W.2d 177, 188 (Iowa 2020). A *Brady* violation occurs when the prosecution (1) suppresses evidence, (2) favorable to the defense

---

[4] Because Sauvain does not distinguish his claim as falling under the state or federal constitution, we consider the substantive standards to be the same as those developed by the United States Supreme Court under the federal due process clause. *See King v. State*, 797 N.W.2d 565, 571 (Iowa 2011).

and (3) material to determining guilt. *State v. Barrett*, 952 N.W.2d 308, 312 (Iowa 2020).

Sauvain's claim fails at the first prong because the prosecution did not suppress the evidence. To be clear, the prosecution must disclose *Brady* material even if the accused does not request the evidence. *DeSimone v. State*, 803 N.W.2d 97, 103 (Iowa 2011). And the prosecution's duty includes learning of any favorable evidence known to the police. *Id.* But we don't consider evidence suppressed if the defendant either knew or should have known of the essential facts, permitting him to take advantage of it. *Id.*

Sauvain contends the decision not to test the bed sheet amounted to suppression. That contention hits two stumbling blocks. First, the State disclosed all known information about the sheet before trial. The February 1 minutes verified that investigators collected the sheet. The August 19 minutes divulged the DCI lab testing, which included only the purple zebra-striped comforter and mattress cover from the inventory of collected items. That inventory showed that the sheet and other items remained housed at the crime lab. Second, although Sauvain alleged at trial that the sheet could be another source for impeachment, the defense knew or should have known the essential facts, allowing it to take advantage of the potentially favorable evidence well before trial. The State did not conceal the fact that the sheet was seized but not tested. Sauvain could have sought additional testing before trial but did not. The State's decision not to test

the sheet for DNA does not amount to suppression of favorable evidence. We find no *Brady* violation occurred.[5]

## B. Jury Instruction on Spoliation

Sauvain next pivots to a different suppression argument. He contends the district court erred by not giving the jury a spoliation instruction on the untested sheet. "A spoliation instruction is 'a direction to the jury that it [may] infer from the State's failure to preserve [evidence] that the evidence would have been adverse to the State.'" *Hartsfield*, 681 N.W.2d at 630 (alterations in original) (quoting *State v. Vincik*, 398 N.W.2d 788, 795 (Iowa 1987)). The instruction is warranted when the defendant shows substantial evidence that "(1) evidence exists, (2) it is in the possession or under the control of the State, (3) it would have been admissible at trial, and (4) the State intentionally destroyed the evidence." *Id.* at 631. If these elements are met, "the fact finder may draw the inference that the evidence

---

[5] We need not address the other two prongs of the *Brady* test. But we note that the record does not show whether DNA testing of the sheet would have been inculpatory or exculpatory. Sauvain only assumes it would have been "favorable to the defendant." *See Barrett*, 952 N.W.2d at 312. Even a favorable DNA result may not have been material to determining guilt. *Id.* To demonstrate materiality, Sauvain must show "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *See id.* (quoting *DeSimone*, 803 N.W.2d at 103). If the testing did not show Sauvain's DNA, that result would have been cumulative to the lack of useful DNA on the other bedding items. It may have added weight to Sauvain's argument that the lack of physical evidence undermined T.G.'s version. But T.G. testified to sexual abuse occurring for many years, not just in late November 2018. The lack of DNA evidence supporting that occasion would not cancel the whole of T.G.'s extensive testimony, accepted by the jurors. Plus, Detective Kennedy testified that someone had been in the house packing in the three weeks between T.G.'s disclosure and the search. The bed had been stripped, so it is unclear which collected items were used at the time of the alleged abuse. On this record, Sauvain would have trouble showing a reasonable probability of acquittal based on a presumed lack of DNA on the sheet.

destroyed was unfavorable to the party responsible for its spoliation." *Id.* at 630 (quoting *State v. Langlet*, 283 N.W.2d 330, 333 (Iowa 1979)). Before giving the instruction, the court must determine that "a jury could appropriately deduce from the underlying circumstances the adverse fact sought to be inferred." *Id.* (citation omitted).

Sauvain's claim fails on the fourth prong. The State did not destroy the sheet—it remained in the crime lab. Plus, Sauvain does not assert that any delay in testing the sheet showed the State's intent to destroy any DNA evidence it may have contained. *See, e.g.*, *State v. Ueding*, 400 N.W.2d 550, 552 (Iowa 1987) (finding no intentional destruction when stolen truck was returned to owner without dusting for fingerprints). Sauvain knew of the sheet's location but did not pursue independent testing. Substantial evidence does not support a finding that the State intentionally destroyed the evidence. Thus the court did not err in denying Sauvain's request for a spoliation instruction.[6]

## C. Prosecutorial Misconduct

In his third swing at the sheet evidence, Sauvain accuses the prosecutor of misconduct for not having the sheet tested and for concealing her role in the testing decision. He points to the testimony of Detective Kennedy explaining that the CSI and the county attorney designated which items to test. Sauvain contends "the County Attorney should have disclosed her role in determining what items would

---

[6] Sauvain did make use of the sheet in closing argument by contending it would have been the best evidence if tested and pointing out that the other DNA evidence exculpated him.

be submitted" to the DCI lab. Sauvain believes the prosecutor's misconduct violated his due process right to a fair trial.

To prevail, Sauvain must show "both that prosecutorial misconduct occurred and that the prosecutorial misconduct resulted in prejudice that denied [him] a fair trial." *State v. Coleman*, 907 N.W.2d 124, 138 (Iowa 2018). Prosecutorial misconduct encompasses actions "by the government that violates a defendant's rights whether or not that conduct was or should have been known by the prosecutor to be improper and whether or not the prosecutor intended to violate the Constitution or any other legal or ethical requirement." *Id.* at 138–39 (quoting Charles Joseph Hynes, *Report to the House of Delegates: Recommendation*, 100B A.B.A. Sec. Crim. Just. 1 (2010)).

Fatal to his claim, Sauvain produces no evidence the prosecutor intentionally chose not to have the sheet tested knowing the lack of DNA would undercut T.G.'s allegation of abuse. Detective Kennedy testified to collecting the blanket because it was draped across the bed. In contrast, the sheet was discarded on the floor. This record supports the State's position that the prosecutor and CSI made a rational decision about which items to be tested based on DCI's limited resources.

Sauvain also faults the prosecutor for "obfuscating" her role in selecting the items to be tested. But he does not explain how the prosecutor's failure to announce her participation in that process violated any "obligation, legal standard, or applicable rule." *See Coleman*, 907 N.W.2d at 139. The State did not keep it secret that the sheet was sent to the crime lab but was never tested. We fail to

see how it was misconduct for the prosecutor not to disclose that she helped decide which evidence would be tested.

Sauvain tries to shift the blame to the State for not developing a potentially useful piece of evidence. He says the defense did not have the option to submit the sheet to an independent laboratory for testing "because the prosecutor obfuscated the situation." But Sauvain is unable to show he was prejudiced by the prosecutor's failure to disclose her role. We are unpersuaded Sauvain would have been more likely to insist on independent testing knowing that the prosecutor had participated in the item selection process than if the call had been made by Detective Kennedy or the CSI agent alone. Under either scenario, Sauvain had the information necessary to seek his own test but did not. He has not shown either prosecutorial misconduct or prejudice.

Because all three grounds urged by Sauvain are meritless, we affirm the denial of the motion for new trial.

## D. Discovery of Confidential Records

Sauvain next contends the district court erred in restricting his access to T.G.'s therapy records. Sauvain moved to produce those records. Over his objection, the court held an in camera review under Iowa Code section 622.10(4). The court concluded that only two of eighty-eight pages contained exculpatory evidence. Sauvain received those two pages. Sauvain now argues the statutory process violated his constitutional rights.[7] We apply a "hybrid standard of review" in this situation. *State v. Doorenbos*, No. 19-1257, 2020 WL

---

[7] Again, Sauvain does not distinguish between state and federal due process protections.

3264408, at *4 (Iowa Ct. App. June 17, 2020). We review due process challenges de novo and nonconstitutional challenges for an abuse of discretion. *State v. Thompson*, 836 N.W.2d 470, 476 (Iowa 2013); *Doorenbos*, 2020 WL 3264408, at *4.

Our legislature created a "confidentiality privilege" for therapy records. *See* Iowa Code § 622.10. Generally, a "counselor" or "mental health professional" cannot "disclose any confidential communication properly entrusted to the person in the person's professional capacity" that was "necessary and proper to enable the person to discharge the functions of the person's office according to the usual course of practice or discipline." *Id.* § 622.10(1). In a criminal case, this privilege is "absolute" and cannot "be construed to authorize or require the disclosure of any privileged records to a defendant." *Id.* § 622.10(4)(a).[8]

Despite being "absolute," the privilege has two exceptions. First, Sauvain may discover the records if T.G. waived the privilege. *See id.* § 662.10(4)(a)(1). Second, Sauvain may discover the records upon "demonstrating in good faith a reasonable probability that the information sought is likely to contain exculpatory information that is not available from any other source and for which there is a

---

[8] The legislature adopted this procedure in reaction to *State v. Cashen*, where the supreme court permitted discovery if the defendant showed "a good faith factual basis that the record sought contain[ed] evidence relevant to the defendant's innocence." 789 N.W.2d 400, 408 (Iowa 2010), *superseded by statute*, 2011 Iowa Acts ch. 8 § 2 (codified at Iowa Code § 622.10(4) (2011)). *Thompson* held that the statutory scheme on its face passes constitutional muster. 836 N.W.2d at 490. *Thompson* also rejected a constitutional challenge to the method of in camera review by the trial judge, rather than by defense counsel. *Id.* at 486. The statutory protocol is deliberately more protective of the alleged victim's records such that "marginally exculpatory" information may be insufficiently "compelling" under the balancing test. *Leedom*, 938 N.W.2d at 188.

compelling need for [him] to present a defense in the case." *Id.* § 622.10(4)(a)(2)(a). If Sauvain achieved that threshold showing, the court had to "conduct an in camera review of such records to determine whether exculpatory information [was] contained" in them.[9] *Id.* § 662.10(4)(a)(2)(b). If the records contained exculpatory information, the court then had to "balance the need to disclose such information against the privacy interest of the privilege holder." *Id.* § 662.10(4)(a)(2)(c). After following this statutory protocol, the court disclosed two pages of T.G.'s records.

Sauvain renews his contention that the statutory protocol interferes with his due process right to form a defense. He believes on remand his attorney should be able to review the entire confidential record without an in camera review, claiming "[o]nly the defense counsel and his client" can assess what is exculpatory. Sauvain's argument echoes portions of an unpublished court of appeals decision critical of the statute. *See State v. Barrett*, No. 17-1814, 2018 WL 6132275, at *3 (Iowa Ct. App. Nov. 21, 2018) ("The statute, by having the district court rather than the attorneys serve as the gatekeeper of the privileged records, has created an unsatisfactory process that generates greater unreliability in the trial process."). Likewise, the district court expressed its opinion that the "[statutory] process would best be served by having defense counsel review the information" and that "the legislature needs to revisit this issue."

---

[9] Exculpatory evidence is evidence that "tends to 'establish a criminal defendant's innocence.'" *Leedom*, 938 N.W.2d at 188 (quoting *Exculpatory Evidence*, *Black's Law Dictionary* (11th ed. 2019)). Here, as in *Brady*, exculpatory evidence includes impeachment evidence. *Id.*

Still, the district court found it was "bound to follow the law as written." So are we. *Cf. Nationwide Agribusiness Ins. Co. v. PGI Int'l*, 882 N.W.2d 512, 518 n.4 (Iowa Ct. App. 2016) ("We are not, however, at liberty to overturn Iowa Supreme Court precedent.").

Turning to the evidence, we have reviewed the confidential records of T.G.'s therapy sessions, including reports and notes taken by her therapists from December 2018 to September 2019. We find no exculpatory evidence beyond the two pages disclosed by the district court. All other information in these records is either known from non-privileged sources, overwhelmingly inculpatory, or neutral. We affirm the decision to release only two pages of these confidential records.

### E. Sentencing

Finally, we turn to Sauvain's sentence. He contends the court abused its discretion by imposing consecutive terms for all three convictions. He argues incarceration not to exceed forty-five years is excessive, is unsupported by the presentence-investigation report (PSI), and fails to foster rehabilitation. Sauvain believes the court was improperly influenced by his lack of remorse and placed too much weight on the crimes' impact on T.G.

We review the imposition of a sentence for the correction of legal error. *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002). We only reverse if the record reveals "an abuse of discretion or some defect in the sentencing procedure." *Id.* Sauvain has a heavy burden because "[t]he decision of the district court to impose a particular sentence within the statutory limits is cloaked with a strong presumption in its favor, and will only be overturned for an abuse of discretion or the consideration of inappropriate matters." *Id.* "[O]ur task on appeal

is not to second guess the decision made by the district court, but to determine if it was unreasonable or based on untenable grounds." *Id.* at 725.

In sentencing Sauvain, the court gave these reasons:

> Mr. Sauvain, I have the option of running these sentences concurrently with each other or consecutive with each other. . . .
>
> . . . .
>
> What I am relying on, Mr. Sauvain, is the fact that you and your need for maximum rehabilitation and society's need for further protection from further offenses by you and the impact that your actions have had on [T.G.], the fact that she has now a life of pain and fear, and that she's [going to] have trust issues for the rest of her life, the fact that your actions have even made her consider committing suicide, and the length of the abuse from elementary through high school, those are the reasons for my decision, Mr. Sauvain, to run these sentences consecutive with each other, for a total of forty-five years.

The written sentencing order included another reason: "Defendant's lack of remorse."

Given the court's overall rationale, its imposition of consecutive sentences was not unreasonably excessive. The court appropriately considered information from the PSI, including a graphic recounting of T.G.'s years of abuse. In the same vein, the court gave appropriate weight to the devastating impact of Sauvain's sexual abuse on T.G. *See State v. Hunter*, No. 01-1919, 2002 WL 31757491, at *3 (Iowa App. Dec. 11, 2002) (holding potential impact of sexual abuse on victim was not an impermissible factor).

On the issue of remorse, Sauvain contends he could not show regret for his conduct because he maintains his innocence. But our supreme court has held that remorse "is highly pertinent to evaluating [the defendant's] need for rehabilitation and [the defendant's] likelihood of reoffending." *State v. Knight*, 701 N.W.2d 83,

88 (Iowa 2005). And the sentencing court may consider the lack of remorse even when the defendant insists he is innocent. *Id.* The court properly did so here.

We discern no abuse of discretion in the imposition of consecutive sentences here. For these reasons, we affirm the convictions and sentences.

**AFFIRMED.**